**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Criminal Case No. 19-cr-257-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ERIC KING,

      Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S AMENDED MOTION TO SUPPRESS**

---

The Government charges Defendant Eric King with one count of assaulting or obstructing a federal official in violation of 18 U.S.C. §§ 111(a)(1), (b).  (ECF No. 1.)

In his Amended Motion to Suppress ("Motion"), Defendant argues that the Court should suppress two sets of statements: (1) statements that Defendant made on August 20, 2018 during an interview with Federal Bureau of Prisons ("BOP") Lieutenants Silva and Erb; and (2) statements that Defendant made on January 31, 2019 at a Discipline Hearing Officer ("DHO") hearing.  (ECF No. 114.)  The Court determined that there were disputed material facts relating to whether these statements were voluntarily made by Defendant (ECF No. 148), and therefore held an evidentiary hearing on the Motion on October 14, 2021 (ECF No. 160).  Following the evidentiary hearing, the parties submitted supplemental briefs at the Court's direction.  (ECF Nos. 168, 174.)

For the reasons set forth herein, the Motion is granted in part and denied in part.

## I. BACKGROUND[1]

### A. Altercation Between Defendant and Lieutenant Wilcox

The Indictment in this case stems from an August 17, 2018 encounter between Defendant, an inmate at Federal Correctional Institution ("FCI") Florence, and FCI Florence Administrative Lieutenant Donald Wilcox. (*See* ECF Nos. 120-1, 120-2.) On August 17, 2018, a correctional officer lieutenant was assaulted by an inmate (not Defendant) at FCI Florence. (*See id.*) Following that incident, Defendant sent an e-mail to his partner regarding that assault. (ECF No. 120-3.) In pertinent part, the e-mail stated:

> So you want to hear great news?! A newer Paisa ROCKED A LT!! That's why we were locked down for a little bit lolol! One for the home team! I hope that the weight of every prisoner who has been disrespected, felt belittled, felt less than human by any guard or Lt ever was behind that punch. Wish I would have gotten to see it or experience it via VR. This is a win for every prisoner ever. Hard to stop smiling thinking about it.

(*Id.*) According to Lieutenant Wilcox's interview report, Special Investigative Services ("SIS") discovered Defendant's e-mail, and SIS Lieutenant Robert Cordova indicated to Lieutenant Wilcox that Defendant needed to be questioned about the e-mail to determine whether he posed a threat to BOP staff. (ECF No. 120-1.) Thus, Lieutenant Wilcox arranged to interview Defendant in a vacant office adjacent to the lieutenants' offices at FCI Florence. (ECF No. 120 at 2; ECF No. 120-1 at 2.) By contrast, Defendant asserts that he was taken to a mop closet to be interviewed. (ECF No. 164

---

[1] All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination. In large part the Court will cite to the parties' briefs and supporting exhibits, and for additional facts and evidence will cite the transcript from the evidentiary hearing on the Motion, located on the docket at ECF No. 164.

at 198–99.)

According to Defendant, he was provoked while in the closet, and he hit

Lieutenant Wilcox in self-defense.  (*Id.* at 200–03.)  By contrast, Lieutenant Wilcox

contends that as he began asking Defendant about the e-mail he sent earlier that day,

Defendant struck Lieutenant Wilcox in the face with a closed fist.  (ECF No. 120-1 at 3.)

As a result of the assault, Lieutenant Wilcox suffered a broken nose, damage to blood

vessels in his eye, and a finger injury.  (*Id.* at 3–4.)

BOP officials investigated the matter and referred it to the Federal Bureau of

Investigation ("FBI") and the United States Attorney's Office ("USAO") for the District of

Colorado for potential prosecution, and the case was accepted for prosecution on the

same day of the alleged offense.  (ECF No. 120-5 at 3.)

**B.     Restraint and Transfer of Defendant**

Defendant testified at the evidentiary hearing that:

> After [the] punch, I'm feeling terror like you wouldn't believe.
> I know from stories, from hearing people, what happens to
> people who are accused of assaulting staff.  So, I need to let
> every staff member I see know, I didn't do this.  This isn't
> what you think happened.  Your co-worker made a mistake.
> It's all right.  He made the mistake, though.  I had to
> respond.
>
> Because these people can kill you.  People die at USP
> Florence.  People die at FCI Florence, and I'm terrified of
> that.  I've got a wife that just had cancer surgery. I'm
> thinking, I have to get home.  People have to know that I
> didn't do this to him.

(ECF No. 164 at 204.)  Defendant testified that after the altercation, he was placed in

handcuffs on his stomach on the ground, numerous guards came and "stomped" him

and kneed him in the ribs, and he "start[ed] getting kicked in the head."  (*Id.* at 205.)

Defendant testified that a "big burly man comes up and says, if you don't talk, you will

live.  But if you try to struggle, I'm going to kill you."  (*Id.* at 206.)  Defendant testified

that "I know if I resist this, I am going to get killed."  (*Id.*)

Defendant states that after the alleged assault on August 17, 2018, he was

placed in a restraint chair, called a "Stryker chair," that was used to transport him to the

Special Housing Unit ("SHU") at FCI Florence.  (*Id.* at 207.)  Defendant described his

experience with being put in the Stryker chair at the evidentiary hearing:

> The Stryker chair is terrifying, because you're vulnerable.
> You can't move.  If they want to pepper spray you, you can't
> protect yourself.  At one time they put on masks, and I think
> that's what they're going to do.  And I'm like, I'm going to
> die.  They're going to suffocate me and say I resisted or spit
> on them, so I'm sitting there staring like a zombie.  I don't
> want to move.  I don't want to resist.
>
> Then they wheel this chair over to the steps, and my
> heart rate is going so fast, because what's the first thought?
> They're going to toss me down these stairs and say it
> slipped.  They think I hit one of theirs. They're going to end
> me right now in this chair.
>
> And they carry me down, thank God they don't throw the
> chair down. But I'm terrified, zombie.  And they wheel me to
> that room, and then they start the four-point process.

(*Id.*)

Nurse Fabroni conducted a medical examination (*id.* at 209), and then BOP

officers placed Defendant into hard, four-point restraints for approximately five hours,

during which time Defendant was stripped of his clothing except for a pair of underwear,

left without a blanket, and ultimately involuntarily urinated himself, which he described

as "humiliating" and made him feel like "an animal having to piss on myself."  (ECF No.

114 at 2; ECF No. 164 at 210.)  At the evidentiary hearing, Defendant described how he

felt in the hard four-point restraints:

> Then they -- the officers -- it's a very dramatic process, because you're handcuffed behind your back, pushed forward, and so they stretch your legs out to make sure they can come up your ankles, and then they pull you back and stretch you like a Garet.  It's not a casual stretch. Within two minutes of this happening, my limbs are on fire.  My back is hurting.  My neck is hurting.  My head is hurting.  You can't breathe.
>
> If you start hyperventilating, you will probably black out, I don't know, but I felt close.  And every limb immediately starts cramping, and then you have the itches.  Every little thing itches, and you cannot scratch yourself.  You can't do anything. You can't bite your arm to make it stop itching, so you're stretched where it feels like your shoulders are being ripped out of your body.  It's not a casual thing, man.  It's not casual.  This is torturous.  And that goes on and on and on.

(ECF No. 164 at 209–10.)  Additionally, Defendant described his interactions with BOP officials while he was in four-point restraints.  He states that Captain Giconi and another BOP official stood over him while he was stretched out, and "they start talking about how now is -- you know we're going to fuck you up; right?  You know we're going to get you raped; right?  We can do that.  We have that power.  And I'm just shaking my head like this cannot be happening."  (*Id.* at 212.)  When officials finally removed Defendant from the hard four-point restraints, he explained that it "just feels like every knife on Earth is stabbing into you."  (*Id.* at 213.)  Five hours later, Defendant was transitioned to soft four-point restraints for approximately an hour and a half.  (ECF No. 114 at 3; ECF No. 164 at 213.)

The four-point restraints were removed later that day when Defendant was transferred to USP Florence.  (ECF No. 113 at 4.)  Defendant described receiving the information that he was being transferred to the penitentiary as

> the scariest thing I've ever heard in my life.  I'm a known

> antiracist activist, and I know that there's a vast difference in custody level between medium and penitentiary. What happens at the penitentiary is stabbing, and I'm thinking they're sending me there to kill me.
>
> I just was accused of hitting one of them. They are going to kill me.

(ECF No. 164 at 215.)

During his three days in the SHU, Defendant states that he was "not permitted a phone call with anyone, including his lawyer," "was not provided a pencil, paper, or other material to write to his family or lawyer," and "the cell he was placed in had an overflowing toilet with feces all over the floor and walls." (ECF No. 114 at 3; ECF No. 164 at 216–17.) Further, he states he did not receive medical care, though he "exhibited an obvious black eye." (ECF No. 114 at 3.)

On August 19, 2018 (the day before Defendant's interview with BOP officials) at USP Florence, Lieutenant Wilcox's son, who also works for the BOP, came to Defendant's cell and "just stands at my door." (ECF No. 164 at 219.) He stated that Lieutenant Wilcox's son stood staring at him for about five or ten minutes and that it made him feel scared. (*Id.* at 219–20.) Defendant testified:

> That is so scary. These guys are militant together. They are -- they stick together. And I can't blame them, but that's how it is. And if he thinks I just assaulted his father? Good Lord. He could open my door at any time, any time, and let another dude in there, let an orderly in there with a knife. That stuff happens at penitentiaries. He could let himself in there and say that I threw poop at him, spray me, and then stomp my head into the ground.
>
> This happens, and I know it happens, and it gives me panic attacks still today even talking about this, because they could have killed me. And my mindset at that time is if I make the wrong move here in any way, these officers are going to get what they want, which is me dead, because they

think I hurt them.  They don't like that.

(*Id.* at 220.)

**C.  August 20, 2018 Interview**

On August 20, 2018, Defendant was given *Miranda* warnings and interviewed at USP Florence by BOP Lieutenants Silva and Erb about Defendant's alleged assault on Lieutenant Wilcox.  (ECF No. 120-6; ECF No. 120-12; ECF No. 164 at 220–25.)  As the correctional officers handcuffed him and walked him to the interview, Defendant explained that he was "terrified," "shaking," "freezing," and had not been sleeping because he was terrified about his family, his health, and his future.  (ECF No. 164 at 221.)  Defendant testified that he sat down in the interview room and that he was "so frayed," and "not afraid, but frayed," as his "mind is three straight days of preparing to get killed, and then now I'm sitting in front of these two officers."  (*Id.*)  He explained at the evidentiary hearing that he felt "[t]his is my chance to save my life.  This is the one chance I have to say, I did not assault your officer.  What you heard is not true.  This is my only chance to do that."  (*Id.*)

The interview was video-recorded, and Defendant signed a written *Miranda* waiver form.  (ECF No. 120-6; ECF No. 120-12.)  Defendant asked questions about when he would be permitted to speak with a lawyer, and he was told, "after all this." (ECF No. 120-6 at 00:50-53.)  Defendant read the waiver form to himself.  (*Id.* at 1:29-1:53.)  Defendant then asked when he would be able to speak to a lawyer.  (*Id.* at 1:53-57.)  Defendant specifically noted, "I assume you guys are prosecuting me so I would need a lawyer," and one of the lieutenants responded in the affirmative, saying "mm-hmm."  (*Id.* at 2:03-07.)  Defendant then asked again about the logistics of how he would get in touch with a lawyer.

7

The lieutenants responded as follows:

> Silva: You'll be given the right to contact your own attorney.
>
> Erb: Before we do anything, we will have to make sure that you are able to make contact with a lawyer.
>
> Defendant: When would I be able to make that contact? Today?
>
> Erb: Probably, yeah.
>
> Defendant: I'd really like to talk to my lawyer.
>
> Erb: Ok.
>
> Defendant: *I still don't mind answering some questions*.
>
> Erb: Ok.
>
> Defendant: But I also want to talk to a lawyer.

(*Id.* at 2:46-2:52 (emphasis added).)  Defendant then read the waiver of rights form aloud (*id.* at 2:53-3:03) and signed it (*id.* at 3:16-3:21; *see also* ECF No. 120-12).  The lieutenants asked if Defendant was willing to answer questions, and Defendant said that he wanted to hear what the questions would be before deciding whether to answer them, and that he would go on a "question by question basis."  (ECF No. 120-6 at 3:45-53.)  Defendant also asked if the lieutenants would be willing to answer some of his questions.  (*Id.* at 3:53-57.)

During the interview, Defendant stated, among other things, that Lieutenant Wilcox assaulted him and that he punched Lieutenant Wilcox in self-defense.  (*Id.* at 4:00–9:00.)  At the end of the interview, Defendant raised a series of concerns about his conditions of confinement, including that his toilet was not working properly and that he did not have a pencil for writing.  (*Id.* at 8:46-11:48.)  He also asked how long he would

be held in the SHU, and whether he would be transferred to another facility.  (*Id.*)  He

refers to the conditions of his cell, remarking ". . . because that in and of itself feels like

coercion.  Do whatever it takes so that you can get out of this cell."  The interview

concluded after 11 minutes and 48 seconds.  (*Id.* at 11:48.)

  At the evidentiary hearing, Defendant testified that:

> It was my absolute total understanding that if I don't do
> this interview in some way, shape, or form, that I'm not
> getting out of their penitentiary, and I'm not talking to my
> lawyer.  So, I can do it their way, or I can do it my way and
> suffer, but I have got to find -- I've gotta pick one, and I
> chose to do it their way to try to save my life and talk to this
> lawyer and get ahold of my family.

(ECF No. 164 at 223.)  Further, he testified that "I have got to preserve my health at this

point by talking to these people, and so I felt like I had no other option."  (*Id.* at 224.)

**D.** **DHO hearing**

  Defendant was transferred to USP Leavenworth on August 21, 2018.  (ECF No.

120 at 4; ECF No. 120-7 at 3.)  Defendant states that in early December 2018, USP

Leavenworth SHU Lieutenant Ratz told him he would not be prosecuted.  (ECF No. 143

at 2–3.)  For support, he relies on a heavily redacted handwritten letter to his wife dated

December 13 (without providing the year), which according to Defendant, memorializes

Lieutenant Ratz's statement.  (ECF No. 143 at 2; ECF No. 143-1.)  In addition, at the

evidentiary hearing, Defendant testified that Lieutenant Ratz came to his cell and told

Defendant that "They're dropping it.  They're dropping the charges."  (ECF No. 164 at

226.)

  At the evidentiary hearing, Defendant testified:

> Q: And so at that time, you feel confident that criminal
> prosecution is not on the table any longer for you?

> A: BOP policy and the lieutenant and the AW have all told me we can't prosecute you if -- or we can't do your DHO if they are prosecuting you.  So, when they come and tell me your prosecution is dead, that tells me I am free to now defend myself in a real way in DHO.

(*Id.* at 227.)

A disciplinary hearing concerning the alleged assault was conducted by DHO Rebecca Bryant on January 31, 2019 at USP Leavenworth.  (ECF Nos. 120-9, 121; *see* ECF No. 164 at 23–61.)  At the evidentiary hearing, Bryant explained that before a DHO hearing, an inmate would be advised of his rights in writing, including the right to remain silent or make a statement.  (ECF No. 164 at 24–28; Gov. Hrg. Ex. 10.)  Defendant signed the Inmate Rights at Discipline Hearing form on January 22, 2019, nine days before his DHO hearing.  (Gov. Hrg. Ex. 10.)  The advisement of rights informed Defendant, among other things, that he had a "right to present a statement or to remain silent," and that his "silence may be used to draw an adverse inference against [Defendant].  .  .  .  However, [Defendant's] silence alone may not be used to support a finding that [Defendant] committed a prohibited act."  (*Id.*)

At the evidentiary hearing, Bryant answered questions regarding whether she would make statements to an inmate regarding whether a particular case was going to be prosecuted.  (ECF No. 164 at 36–37.)  She testified that she would tell the inmate whether the case was released or referred for administrative processing.  (*Id.*)

There are two versions of the February 21, 2019 DHO report concerning the assault.  The first version of the report was produced to Defendant's prior counsel in 2019.  (ECF No. 138 at 2–3.)  The second version was received by the Government on September 21, 2021 and produced to defense counsel on September 23, 2021.  (*Id.* at

3.)

In both versions of the DHO report, the "Summary of inmate statement" says, "I was take [*sic*] to the mop closet to be interviewed, not the Lieutenant's office.  That is where they take people and try to get them to snitch.  I was provoked, that is why I hit him.  To defend myself.  He hit me."  (ECF No. 121 at 1; ECF No. 120-9 at 1.)

According to the first version of the DHO report, "[t]he FBI/AUSA did decline to prosecute on December 11, 2018, at which time it was released for administrative processing."  (ECF No. 121 at 2.)  The first version contains language stating that it was "delivered to Inmate" by R. Bryant.  (*Id.* at 4.)  However, the second version states that "[t]he FBI/AUSA accepted this case for prosecution on December 11, 2018, however permission was granted to proceed with administrative processing."  (ECF No. 120-9 at 2.)  The section of the second version concerning "delivered to Inmate" is blank.  (*Id.* at 5.)

At the evidentiary hearing, Bryant was unable to account for the difference between the two versions of the DHO report.  (ECF No. 164 at 33.)  She stated that she believed that the correct copy of the report was the second version, which states that the FBI/AUSA accepted the case for prosecution because that version had a cover page that she recognized as being part of her standard documentation.  (*Id.*; Gov. Hrg. Ex. 9.)  Ultimately, both reports reflect that Defendant was "found to have committed the prohibited act."  (ECF No. 120-9 at 5; ECF No. 121 at 5.)

Correspondence between two BOP personnel on February 6, 2019—15 days before the DHO report was issued—reflects that BOP employee Mack Word inquired of Lieutenant Cordova whether Defendant was going to be prosecuted.

(ECF No. 120-11.)  Lieutenant Cordova replied, "Absolutely," and referred Word to an attachment to his e-mail, which contained an inmate investigative report regarding the assault on August 17, 2018.  (*Id.*)

## II. LEGAL STANDARD

In this case, the Government only intends to use the statements at issue for impeachment and cross-examination if Defendant testifies at trial.[2]  (ECF No. 120 at 5–6.)  Therefore, the Court need not address whether Defendant received proper *Miranda* warnings before making the statements, *Harris*, 401 U.S. at 225–26; rather, the Court need only determine whether the statements were voluntary.

Even where *Miranda* warnings are not at issue, any statements extracted from a defendant must still have been made "voluntarily." *United States v. O'Neal*, 2018 WL 3145523, at *12 (D. Colo. June 27, 2018), *aff'd*, 796 F. App'x 513 (10th Cir. 2019) (citing *Beckwith v. United States*, 425 U.S. 341, 348 (1976) (statements resulting from noncustodial questioning can still be challenged on voluntariness grounds); *Lego v. Twomey*, 404 U.S. 477, 487–88 (1972) (treating the voluntariness of a confession as a separate issue from *Miranda* warnings)).  The Tenth Circuit instructs that "[t]he voluntariness of a statement depends upon an assessment of the totality of all the surrounding circumstances including both the characteristics of the accused and the details of the interrogation." *United States v. Cash*, 733 F.3d 1264, 1280–81 (10th Cir.

---

[2] Statements made under custodial interrogation, without proper warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966) are generally inadmissible in the prosecution's case in chief. *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1148 (10th Cir. 2006) (citing *United States v. Patane*, 542 U.S. 630, 639 (2004)).  However, statements given without proper *Miranda* warnings can nonetheless be used for cross-examination and impeachment purposes as long as they were voluntary. *See, e.g.*, *Harris v. New York*, 401 U.S. 222, 225–26 (1971); *United States v. Stoner*, 466 F. App'x 720, 725–27 (10th Cir. Mar. 12, 2012).

2013) (quoting *United States v. Chalan*, 812 F.2d 1302, 1307 (10th Cir. 1987) (internal quotation marks omitted)).

In applying a totality of circumstances analysis, a court in the Tenth Circuit considers: (1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to any physical punishment. *Id.* (citing *United States v. Lopez*, 437 F.3d 1059, 1063–64 (10th Cir. 2006)).

The Supreme Court in *Colorado v. Connelly*, 479 U.S. 157 (1986), further clarified that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Id.* (quoting *Connelly*, 479 U.S. at 167). The Due Process Clause is not implicated without the "crucial element of police overreaching." *Connelly*, 479 U.S. at 163. "Accordingly, it is clear after *Connelly* that a confession is only involuntary . . . if the police use coercive activity to undermine the suspect's ability to exercise his free will." *Cash*, 733 F.3d at 1281 (quoting *United States v. Erving L.*, 147 F.3d 1240, 1249 (10th Cir. 1998)). But "[e]ven where there is causal connection between police misconduct and a defendant's confession, it does not automatically follow that there has been a violation of the Due Process Clause." *Connelly*, 479 U.S. at 164 n.2.

Voluntariness is judged under an expansive standard:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*O'Neal*, 2018 WL 3145523, at *12 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).  With respect to a defendant's statements, "[t]he burden of proof is on the government to prove [by a preponderance of the evidence] the statements were voluntary."  *Id.* (quoting *United States v. Muniz*, 1 F.3d 1018, 1021 (10th Cir. 1993)).

### III. ANALYSIS

**A.    Voluntariness of Defendant's August 20, 2018 Statements**

Defendant requests that the Court suppress the statements he made at the August 20, 2018 interview.  (ECF Nos. 114, 143.)  For support, Defendant emphasizes that he was subjected to physical punishment and held incommunicado for nearly three days directly before the interview.  (ECF No. 143 at 4.)  According to Defendant, he was subjected to specific "punitive acts" including: closed fist punches to the head and face, physical abuse by BOP staff, restraint in hard four-point restraints without penological purpose for over five hours, being forced to involuntarily urinate on himself, being left without a blanket wearing only a thin pair of underwear, being deprived of any communication with his lawyer and/or family for at least three days, and being forced to remain in a "revolting, feces-strewn unsanitary cell" for three days.  (ECF No. 114 at 8.)  He also points out that he was presented "misinformation about when and how he could have access to a lawyer."  (ECF No. 143 at 4.)  Additionally, Defendant contends that there was no break in the stream of events from his confinement, which began on August 17, 2018, to his August 20, 2018 interview.  (ECF No. 114 at 11.)

In response, the Government argues that the video of the interview shows that Defendant was clear-headed and retained the capacity for rational decision-making.  (ECF No. 120 at 7.)  The Government points to Defendant's demeanor, his posture, his

manner of speaking, all of which the Government contends demonstrate he was calm and composed throughout the interview.  (*Id.*)  Further, the Government underscores that during the interview, Defendant had the presence of mind to ask questions about the *Miranda* waiver form and read the form to himself and aloud.  (*Id.*)

Regarding Defendant's contention that his conditions of confinement between the assault and the interview render his statements involuntary, the Government again heavily relies on the video to support its argument that Defendant was "fully in control of his faculties."  (*Id.* at 8 (citing *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) ("The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity does not render a confession involuntary.")).)  Because the relevant inquiry is whether Defendant's will was "overborne" or his capacity for self-determination was "critically impaired," the Government contends that the video shows Defendant is "unmistakably calm, self-possessed, and articulate."  (*Id.* at 8–9.) According to the Government, Defendant is "clearly not intimidated by the officers," which is supported by the fact that Defendant asked questions and affirmatively raised the issue of conditions in his cell during the interview.  (*Id.* at 9.)

As explained above, the Court applies the totality of the circumstances analysis, as refined in *Connelly*, to determine whether Defendant's statements were voluntary. *Cash*, 733 F.3d at 1280–81.  Having carefully considered the parties' arguments in their briefs, as well as the witnesses' testimony at the evidentiary hearing, for the following reasons, the Court finds that Defendant's statements to Lieutenants Erb and Silva on August 20, 2018 were not voluntary and must be suppressed.

The Court considers the fifth factor first because analysis of this factor

demonstrates the coercive nature of law enforcement's actions in this case, which *Connelly* instructs is a predicate for finding a confession involuntary.  Indeed, the Court's conclusion that the statements must be suppressed turns on the physical punishment and psychological intimidation Defendant suffered in the three-day period between his alleged assault on Lieutenant Wilcox and the August 20, 2018 interview. Regarding actual violence against Defendant, the Government contends that Defendant's testimony that several guards kicked him in the head and stomped him in the ribs is not credible because it is rebutted by the video of Defendant in the Stryker chair and during the medical assessment.  (ECF No. 174 at 13.)  While the Court agrees with the Government that some of Defendant's testimony on this point is inconsistent with the video evidence and the medical assessment, Defendant appears to have a black eye in the video footage of the interview.  Further, it is possible that some kicks to his body might not have resulted in bruising or broken bones, but could nonetheless have occurred during the BOP officials' restraint of Defendant.

And, nonetheless, the Court finds the hours-long confinement in hard four-point restraints, with almost no clothing, and so little access to a restroom that Defendant was forced to urinate on himself, were coercive actions by the BOP.  Defendant's description of the physical pain of being in hard four-point restraints for at least five hours (not to mention the pain he described after the restraints were removed) persuade the Court that the events leading up to his interview overbore Defendant's will.  Moreover, some of the physical punishment Defendant suffered was not necessarily violence against his body.  Instead, the unsanitary conditions of his confinement—specifically having an

overflowing toilet full of feces—caused him physical distress as well.[3]

But it is not the physical punishment alone that persuades the Court that Defendant's will was overborne by the BOP's actions.  Significantly, it is the psychological intimidation that Defendant states that he suffered at the hands of Captain Giconi, Lieutenant Wilcox's son, and other BOP officials which convinces the Court that Defendant's statements ultimately were not voluntary.  At the very least, the Court finds that it could be intimidating for Defendant, who is accused of assaulting a correctional officer, to see that officer's son—also a correctional officer—standing silently outside his cell for five to ten minutes.  And taken to a more extreme level, the Court also concludes that Defendant's testimony that Lieutenant Wilcox's son's presence caused Defendant to fear for his physical safety and his life was credible.  (ECF No. 164 at 219–20.)  Moreover, the BOP kept Defendant incommunicado, despite his lawyer's efforts to contact him, and deprived him of writing materials to contact his family, friends, and counsel.  (*Id.* at 219.)

The voluntariness determination reflects a balancing of values, with one interest "'the acknowledged need for police questioning as a tool for the effective enforcement of criminal laws,'" and another interest "'society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice.'" *Lopez*, 437 F.3d at 1063 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 224–25

---

[3] At the evidentiary hearing, Captain David Root, a BOP official at ADX Florence, testified about standard protocols at USP Florence regarding hygiene, writing implements, medical visits, among others.  (ECF No. 164 at 182–97.)  However, while Captain Root was a credible witness, he had no personal knowledge of the circumstances of Defendant's confinement during the relevant time period, and thus the Court affords his testimony little weight.

(1973)).  Here, although the Government correctly observes that Defendant's demeanor during the interview was calm, composed, compliant, and even confident, the Court cannot ignore the accumulation of physically and psychologically punishing circumstances he endured during the days leading up to that interview.  The Court found Defendant's testimony regarding his physical pain resulting from the hard four-point restraints and his fear that the BOP officials might hurt him in retaliation for his alleged assault on Lieutenant Wilcox highly credible.  As a result, the following statements he made at the evidentiary hearing regarding why he participated in the August 20, 2018 interview are also highly credible:

> It was my absolute total understanding that if I don't do this interview in some way, shape, or form, that I'm not getting out of their penitentiary, and I'm not talking to my lawyer.  So, I can do it their way, or I can do it my way and suffer, but I have got to find -- I've gotta pick one, and I chose to do it their way to try to save my life and talk to this lawyer and get ahold of my family.

(ECF No. 164 at 223.)

The Court also considers the other factors of the totality of the circumstances test, all of which weigh in favor of the voluntariness of Defendant's statements, but ultimately do not tip the balance in the Government's favor.  Regarding the first factor, which considers the age, intelligence, and education of a defendant, the Court notes that Defendant concedes that he does not suffer from any specific characteristics that would leave him unusually susceptible to coercion, which weighs in favor of the voluntariness of his statements.  (ECF No. 114 at 12; ECF No. 168 at 12.)

With respect to the second, third, and fourth factors, Defendant does not appear to argue that the length of the questioning, which was approximately 12 minutes, was

overly lengthy.  *See Carter v. Bigelow*, 787 F.3d 1269, 1295 (10th Cir. 2015) (noting that

questioning was not unusually rigorous where a defendant was interrogated for eight to

ten hours across two days); *United States v. Brannon*, 2014 WL 12789706, at *10

(D.N.M. July 22, 2014) (finding interview of thirty to forty-five minutes was reasonable

and not prolonged).  In fact, Defendant does not assert he was held for an inordinate

amount of time during the interview.  In terms of the nature of the questioning, it

appears as though the officers were calm, did not yell, and did not approach Defendant

in a manner meant to physically intimidate him.  *See Brannon*, 2014 WL 12789706, at

*10 (questioning was not aggressive or intimidating).  Defendant was advised of and

waived his constitutional rights, though Defendant challenges whether he properly

received and waived his *Miranda* warnings.[4]  Critically, before the officers ask him

questions, Defendant clearly says "I don't mind answering some questions."  Thus,

these factors weigh in favor of the voluntariness of the statement.

Despite the Court's conclusion that factors one through four weigh in favor of the

voluntary nature of Defendant's statements, those factors simply do not outweigh the

coercive effect that the physical and psychological suffering at the hands of BOP

officials apparently had on Defendant.[5]  Therefore, in light of the foregoing, the Court

finds that the Government has not met its burden to demonstrate that Defendant's

statements at the interview were voluntary.  Accordingly, the Court concludes that

---

[4] As explained above, *supra* Part II, the Court need not consider whether Defendant received proper *Miranda* warnings, as the Government only intends to use the challenged statements on cross-examination for impeachment purposes.

[5] The Government declined to cross-examine Defendant at the evidentiary hearing, and therefore relinquished the opportunity to challenge his account through rigorous cross-examination.

Defendant's will was overborne such that his statements on August 20, 2018 were involuntary and must be suppressed.

## B.   Voluntariness of Defendant's January 31, 2019 DHO Hearing Statements[6]

Defendant requests that the Court suppress the statements he made in conjunction with the DHO hearing on January 31, 2019, arguing that he would not have made such statements but for the Government's promise not to prosecute him for the alleged assault.  (ECF No. 114 at 10.)  Defendant argues that BOP officials' statements to him in this case involve manipulation or false promises of leniency, which Defendant relied on to his detriment.  (ECF No. 143 at 3.)  For support, Defendant relies on a heavily redacted letter that he wrote to his wife on December 13 memorializing statements that Lieutenant Ratz made in which he allegedly told Defendant that he would not be prosecuted, and version 1 of the DHO Report which was delivered to Defendant[7] and states the FBI and USAO declined to prosecute the case.  (ECF Nos. 114-7, 143-1.)  Defendant posits that version 2 of the DHO Report may have been

---

[6] Where a previous interview produced an involuntary confession, a later confession's admissibility depends on whether the "'coercion surrounding the first [confession] had been sufficiently dissipated so as to make the second statement voluntary.'"  *Lopez*, 437 F.3d at 1066 (quoting *United States v. Perdue*, 8 F.3d 1455, 1467 (10th Cir. 1993) (alteration in original).  The government must show "'intervening circumstances which indicate that the second confession was insulated from the effect of all that went before.'"  *Id.* (quoting *Perdue*, 8 F.3d at 1467–68).  "This 'depends on the inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances.'"  *Id.* (quoting *Lyons v. Oklahoma*, 322 U.S. 596, 602 (1944)).

Here, however, Defendant does not argue that the circumstances which led to his first involuntary confession carried over such that they rendered his statements in connection with the DHO hearing similarly involuntary.  (*See, e.g.*, ECF No. 168.)  Accordingly, the Court finds that the coercion surrounding the first confession had sufficiently dissipated such that it did not affect the admissibility or voluntariness of Defendant's statements at the DHO hearing on January 31, 2019.

[7] The second version of the report appears not to have been delivered to Defendant.

"doctored or selectively amended."[8]  (ECF No. 143 at 2 n.1.)  In addition, Defendant points out that under the rules of BOP disciplinary proceedings, his silence could have been used to draw an adverse inference at the DHO hearing, suggesting that such presumption, coupled with his belief that the danger of prosecution had lifted, prompted him to make statements he otherwise might not have made.[9]  (ECF No. 143 at 3.)  In his supplemental briefing, Defendant also points to Bryant's testimony at the evidentiary hearing regarding whether his case would be prosecuted or released for administrative processing to support his assertion that he relied on officials' statements that he would not be prosecuted.  (ECF No. 168 at 17.)

According to Defendant, "[w]hat is material in the voluntariness inquiry is what

---

[8] The Court is troubled by the existence of two different versions of the DHO report. However, because there is no evidence that Defendant received either version of the report before he made his statements at the DHO hearing, the Court will not address to a great degree the impact of the two versions of the DHO reports on the voluntariness of his statements. Suffice it to say that to the extent Bryant discussed the two versions of the report at the evidentiary hearing, the Court finds that Bryant's testimony on this matter was of little help or even relevance to determining the voluntariness of Defendant's statement.  Bryant testified that she was unable to account for the difference between the two documents.  (ECF No. 164 at 25.) Because she could not specifically recall the DHO hearing with Defendant (*id.* at 39), the Court can draw no inference regarding which version of the report would have informed Bryant's interaction with Defendant or her particular statements to him at the DHO hearing.

And to the extent Defendant testified at the evidentiary hearing that Bryant informed him that "the FBI AUSA released the prosecution," in light of Bryant's contradictory and confusing testimony, the Court finds Defendant's testimony also has little evidentiary value because it is contradicted by some of Bryant's testimony and is not entirely credible.  (ECF No. 164 at 230.) All the Court can discern is that Bryant and Defendant may have discussed that his case was released for administrative processing, but not necessarily that his case was certainly not going to be prosecuted by the FBI and USAO.

[9] To the extent Defendant argues the BOP policy itself (which permits an adverse inference to be drawn against an inmate based on his silence during a disciplinary proceeding) is coercive (ECF No. 168 at 16), the Court disagrees.  The Supreme Court has found that "[t]he short of it is that permitting an adverse inference to be drawn from an inmate's silence at his disciplinary proceedings is not, on its face, an invalid practice."  *Baxter v. Palmigiano*, 425 U.S. 308, 320 (1976).  The Government's point that "Defendant may regret making that statement now, but it was not the product of police coercion," (ECF No. 174 at 17) is well-taken.

[he] believed at the time of the hearing when he made incriminating statements."[10] (ECF No. 143 at 2.)  Defendant compares this situation to the promise of leniency offered in *Lopez*, stating it is "akin to the government's promise of a fictional plea deal for Mr. Lopez."[11]  (ECF No. 114 at 10.)

Despite Defendant's arguments, the Court will not suppress the statements Defendant made in connection with the DHO hearing for the simple reason that it cannot conclude that either Lieutenant Ratz's purported statement to Defendant or Bryant's statements to Defendant at the DHO hearing constitutes the type of coercive police misconduct necessary to find statements involuntary under *Connelly*.  Indeed, the Court agrees with the Government's argument that "this is not a situation where the defendant was badgered into confessing to a crime or into making a statement through a promise of leniency."  (ECF No. 174 at 16.)

"[A] promise of leniency is relevant to determining whether a confession was

---

[10] Defendant cites no case law to support this statement.

[11] In *United States v. Lopez*, an officer wrote slips of paper as a visual to show a defendant that if he confessed to killing as a mistake, that he would receive 6 years instead of 60 years.  437 F.3d at 1064.  The officer also said others had received lenient sentences after confessing to accidental killings.  The Tenth Circuit affirmed the trial court's finding that this was not the type of permissible vague and non-committal promise but was an actual promise that the defendant would spend 54 fewer years in prison if he would confess to killing a person by mistake.  *Id.* at 1064–65.  The Tenth Circuit held that the "nature of [such] a promise may indeed critically impair a defendant's capacity for self-determination" and found the confession to be involuntary.  *Id.*  In suppressing both Lopez's first and second confessions, the Tenth Circuit found that although almost twelve hours had elapsed between Lopez's first and second confessions, the coercion producing the first confession had not dissipated at the time of the second confession.  *Id.* at 1066.  Moreover Lopez had not spoken to an attorney or family member during the 24 hours since he had been arrested.  *Id.* at 1067.

The Court finds that Defendant's situation is distinguishable from that in *Lopez*, because in this case, there is no evidence that a BOP official or other law enforcement representative offered Defendant any lesser prison sentence or other incentive to make statements at the DHO hearing.  As such, the Court is not persuaded that Lieutenant Ratz's or Bryant's statements to Defendant are sufficient evidence to render Defendant's statements at the DHO hearing involuntary.

involuntary and, depending on the totality of the circumstances, may render a confession coerced." *United States v. Hatathle*, 2008 WL 4642963, at *8 (D. Utah Oct. 17, 2008) (citing *Clanton v. Cooper*, 129 F.3d 1147, 1159 (10th Cir. 1997)).  However, at least one circuit court has found that "[g]iven the narrowed definition of coercion in *Connelly*, it would be very hard to treat as *coercion* a false assurance to a suspect that he was not in danger of prosecution."  *United States v. Byram*, 145 F.3d 405, 408 (1st Cir. 1998) (emphasis in original).

Here, the record shows the FBI and USAO accepted the case for prosecution on the day of the assault.  (ECF No. 120 at 9 (citing ECF No. 120-5); ECF No. 174 at 14.) In addition, internal BOP e-mails from February 6, 2019, confirm that at least two BOP officials understood that the prosecution would continue before the DHO report was issued.  (*Id.* (citing ECF No. 120-11).)  Additionally, version 2 of the DHO report reflects that the case *would* be prosecuted, and Bryant testified that she believed that version 2 was the correct version.  (*Id.* (citing ECF Nos. 120-9 and 121); ECF No. 164 at 33; ECF No. 174 at 15.)  Defendant also signed the advisement of rights form several days before the DHO hearing.  (Gov. Hrg. Ex. 10.)

To the extent Defendant relies on Lieutenant Ratz's statements and the letter to his wife memorializing Lieutenant Ratz's purported statements to him that he would not be prosecuted, his argument is unavailing.  First, the Court observes that Defendant's letter to his wife is dated "Thursday 13 Dec[ember]" but contains no year, though to the Court, it seems like a logical inference that the year was 2018.  (ECF No. 143-1.) Regardless, whatever statements Lieutenant Ratz made to Defendant were made in early December 2018, weeks before the January 2019 DHO hearing.  The letter also

states, "He said,"—presumably meaning Lieutenant Ratz made additional statements to Defendant—but the text after those words is redacted.[12] (*Id.*)  Defendant did not provide an unredacted version of this letter for the Government or the Court in his briefing or at the evidentiary hearing.  The Court also observes that Defendant only filed this letter for the first time in this case in his reply to the Government's response to the Motion (instead of filed as an exhibit to the Motion itself), and that the letter is heavily redacted, without explanation, including a very lengthy portion of what Lieutenant Ratz allegedly told Defendant.  Given these circumstances, the Court maintains a healthy degree of skepticism regarding the evidentiary value of the letter.

Despite these misgivings, the Court nonetheless concludes that the purported statements by Lieutenant Ratz to Defendant regarding whether Defendant would be prosecuted do not rise to the level of "coercive police activity" necessary to render a confession involuntary.  *Connelly*, 479 U.S. at 167.  Lieutenant Ratz's statements do not even appear to constitute trickery of any sort.  Here, there is no allegation that Lieutenant Ratz told Defendant he would not be prosecuted or promised any leniency in exchange for a confession or any statements at the DHO hearing.  *Cf. Sharp v. Rohling*, 793 F.3d 1216, 1234 (10th Cir. 2015) (holding that defendant's statement was involuntary where interviewing detective falsely told defendant repeatedly that she would not go to jail as long as she cooperated and continued speaking to police).  To the contrary, based on Defendant's testimony at the evidentiary hearing, it appears to the Court that he and Lieutenant Ratz had a cordial relationship, whereby according to Defendant, Lieutenant Ratz brought him coffee and Cocoa Puffs and "had a little party"

---

[12] Defendant is the only party to submit this letter in evidence.  It is unclear who redacted the letter or why.  The Court only has the redacted version to consider here.

to celebrate the charges being dropped and Defendant being transferred.  (ECF No. 164 at 226–27.)  At the evidentiary hearing, Defendant did not imply that Lieutenant Ratz made these statements to him to coerce a confession or statement at the DHO hearing.  Thus, the Court concludes that Lieutenant Ratz's statements to Defendant were not coercive police misconduct and thus did not render any statements Defendant made in connection with the DHO hearing involuntary.

The Court reaches a similar conclusion with respect to Bryant's statements to Defendant at the DHO hearing.  As an initial matter, in the Court's view, Bryant's testimony was generally unclear, sometimes contradictory, and ultimately incredibly confusing, and for these reasons, the Court gives all of her testimony almost no weight. Bryant testified that as part of her standard practice she "would" tell an inmate whether the FBI or USAO had accepted or declined a case for prosecution.  (ECF No. 164 at 36.)  However, moments later, she testified that she would tell the inmate "the reason for delay was pending FBI referral" and that she might discuss whether a case was released or referred for administrative processing.  (ECF No. 164 at 37.)  When directly asked whether she would specifically say whether the FBI or USAO had accepted or declined a case for prosecution, she testified, "No.  I would have said it's released. Released for administrative processing."  (*Id.*)  Later, the following questions were asked, and Bryant gave the following answers:

> Q: When you inform an inmate of the status of where the AUSA is at with their case, does that differ depending on whether they are being prosecuted or not?
>
> A: I don't -- my phrasing -- and again, this is a general phrasing that I used in every hearing, is that the FBI and/or AUSA has elected to proceed with administrative -- or has released for administrative processing.  I never reiterate a

case has been -- I had no -- nothing about the case as far as
on the criminal side of it.  It's everything administrative.
Does
that answer your question?  Is that where --

Q: . . . So, you're saying that you wouldn't necessarily relay
that information to a defendant in the DHO hearing?

A: I would not know the case regarding the criminal matter.

. . .

Q: . . . If the FBI or AUSA declines a case for prosecution,
does that automatically release the case for administrative
processing?

. . .

A: Yes.

(ECF No. 164 at 49–50, 53.)

Based on Bryant's aforementioned testimony, it appears as though a release or

referral for administrative processing indicates that a case will not be prosecuted, but,

as the testimony above shows, that connection was never made *completely* clear at the

evidentiary hearing.  According to Bryant's testimony, if the USAO declined a case for

prosecution, that would apparently automatically release it for administrative processing.

However, Bryant's testimony does not explicitly clarify that if a case if released for

administrative processing that a case will necessarily not be prosecuted.  Indeed, that

appears to be precisely what happened in this case—Defendant's case was released

for administrative processing but was still being prosecuted by the FBI and USAO.

Bryant also testified that she would not have a specific recollection about a particular

case, so she could not testify as to what she specifically told Defendant, but only could

state generally what she would discuss with an inmate.  (*Id.* at 25, 39.)

Given the confusing, contradictory nature of Bryant's testimony, the Court affords it almost no weight.  And even if Bryant *did* tell Defendant that his case was not going to be prosecuted, the Court reaches the same conclusion as it did concerning Lieutenant Ratz's statement to Defendant: Bryant's statement simply does not rise to the level of "coercive" police misconduct sufficient to render Defendant's statements at the DHO hearing involuntary.  Accordingly, the Court concludes that Defendant's statements at the DHO hearing were voluntary and therefore denies Defendant's request to suppress those statements.

## IV. CONCLUSION

For the reasons stated above, the Court ORDERS:

1.  Defendant's Amended Motion to Suppress Evidence (ECF No. 114) is GRANTED PART AND DENIED IN PART to the extent stated above; and

2.  The Court will enter a separate Order resetting the Final Trial Preparation Conference and the trial date.

Dated this 29th day of November, 2021.

BY THE COURT:

William J. Martinez
United States District Judge